IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| EARLINE COLE, as an individual and as personal representative of the ESTATE OF STEVEN BEARCRANE, CLETUS COLE, as an individual and as personal representative of the ESTATE OF STEVEN BEARCRANE, PRECIOUS BEARCRANE, minor child, VERONICA SPRINGFIELD, as an individual and as personal representative of the ESTATE OF ROBERT SPRINGFIELD, and VELMA SPRINGFIELD, minor child, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATIONS, SALT LAKE CITY FIELD OFFICE, UNITED STATES ATTORNEY'S OFFICE FOR SOUTH DAKOTA, ERNEST WEYAND, in his individual and official capacity, and MATTHEW ORAVEC, in his individual capacity, <br><br> Defendants. | CV-09-21-BLG-RFC-CSO <br><br> <u>FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE ON MOTION TO DISMISS</u> |

This action arises from alleged discrimination against Native

Americans in criminal investigations and prosecutions on or near the
Crow Indian Reservation.  Jurisdiction is based on 28 U.S.C. § 1331.
Chief Judge Cebull has referred the case to the undersigned for all
pretrial proceedings.  Court Doc. 6.

Now pending is Defendants' Motion to Dismiss the Amended
Complaint (Court Doc. 28).  Having considered the parties' briefs and
the applicable law, the Court enters the following Findings and
Recommendations.

## I.  BACKGROUND

### A.  Parties

Plaintiffs are members of two separate families, which the Court
will refer to as the Cole/Bearcrane family and the Springfield family.
The Cole/Bearcrane plaintiffs include Earline and Cletus Cole, the
parents of Steven Bearcrane, deceased, and Precious Bearcrane, the
minor daughter of Steven Bearcrane.  Amended Complaint (Court Doc.
21-1) at 6, ¶ 18.  Earline and Cletus Cole have filed this action both
individually and as personal representatives of the Estate of Steven
Bearcrane.   Precious Bearcrane and Earline Cole are members of the
Crow Tribe and current residents of Montana.  Cletus Cole is a member

2

of the Gros Ventre Tribe and also a Montana resident.  Id. at 2, ¶¶ 1-3.

The Springfield plaintiffs include Veronica Springfield, the wife of Robert Springfield, deceased, and Velma Springfield, the minor daughter of Robert Springfield.  Id. at 6, ¶ 18.  Veronica Springfield brings this action both individually and as the personal representative of the Estate of Robert Springfield.  Both Velma and Veronica Springfield are members of the Crow Tribe and are Montana residents. Id. at 2-3,  ¶¶ 4-5.

The Defendants are: (1) the Federal Bureau of Investigations ("FBI"), Salt Lake City Field Office, (2) the United States Attorneys Office for South Dakota ("USAO-SD"), (3) Ernest Weyand, individually and in his official capacity as the Supervising Agent in the FBI's Billings, Montana, office; and (4) Matthew Oravec, individually and as a Special Agent in the FBI's Billings, Montana, office.  Id. at 3-4, ¶¶ 6-10.

   B.  Fact Allegations[1]

      1.  Fact Allegations Against FBI, Weyand and Oravec

----

[1]The fact allegations in this section are taken from Plaintiffs' Amended Complaint.  Court Doc. 21-1 at 5-30.

Contending that there is a "Policy of Discrimination Against Native Americans in Investigation and Prosecution of Crimes," the Amended Complaint alleges generally that "[c]rime is rampant and out of control in Indian Country...." Id. at 7, ¶ 21.  To illustrate this statement, the Amended Complaint recites statistics along with statements from public officials about crime in Indian County.   None of the statistics or statements mention either the Crow Tribe or the Gros Ventre Tribe. Id. at 7-12.

Plaintiffs allege that Defendants FBI, Oravec, and Weyand "engaged in a pattern and practice of selectively discriminating against Native Americans in providing police services and protection on the Crow reservation in Montana...." Id. at 13.  With respect to Steven Bearcrane, the Amended Complaint alleges that he was shot in the head and killed by a non-Indian on February 2, 2005, at a ranch located on the Crow Indian Reservation.  The coroner ruled the death a homicide; a non-Indian man admitted to shooting Bearcrane, claiming that he shot in self-defense during a dispute over a horse.   Plaintiffs allege that Weyand and Oravec were assigned to investigate Bearcrane's death but, despite repeated requests, "refused to do

4

anything but the most cursory investigation...." Id. at 14.  Plaintiffs also allege that the FBI destroyed evidence in connection with this investigation.  Id. at 13-15.

With respect to Robert Springfield, the Amended Complaint alleges that Velma Springfield reported her husband missing after a hunting trip, but Defendants FBI, Oravec, and Weyand refused to investigate his disappearance.  After Mr. Springfield's body was found, it is further alleged that they failed to investigate his death and failed to positively identify his remains "even though there was compelling evidence for the identification." Id. at 15-16.  Plaintiffs allege that this conduct is part of a pattern of conduct by the FBI of consistently closing cases involving Indian victims without adequate investigation.  Id. at 16-17.

Plaintiffs also allege that Oravec has consistently shown animus against Native Americans, not only refusing to perform adequate investigations of crimes in which Native Americans were victims, but also acting  affirmatively to hinder investigations of those crimes and to prevent victims from receiving assistance and other rights afforded crime victims under federal law.  Id. at 18.  When Defendant Weyand

5

was alerted to this "egregious mishandling" of the Bearcrane and Springfield cases, he allegedly refused to remedy the situations. Id. at 19-20.

### 2. Fact Allegations Against the U.S. Attorney's Office

Only the Cole/Bearcrane plaintiffs bring claims against Defendant USAO-SD.[2] See Court Doc. 21.  They allege that the USAO-SD, as part of a pattern and practice of declining prosecutions in cases with Native American crime victims, refused to prosecute the person who shot Steven Bearcrane.

### 3. Damage Claims

Plaintiffs claim the following injuries and damages.  By Defendants' acts of discrimination in providing less law enforcement and prosecutorial services to them as Native Americans than to other citizens, Plaintiffs have suffered "severe psychological impacts." Id. at 22.  And, they are more likely to be victimized by assault or other

---

[2]Defendant Marty Jackley, former U.S. Attorney for the District of South Dakota, was dismissed from the case on October 30, 2009, with Plaintiffs' consent.  Court Doc. 36.

violent crime.  They have been deprived of benefits and protections accorded to non-Native Americans under the Crime Victims' Rights Act, 18 U.S.C. § 3771.  Id. at 23-26.

As a result of the actions of Oravec and Weyand, Plaintiffs claim to have suffered, and continue to suffer, emotional and physical damages, including depression and loss of family relations and structure.  Id. at 26-27.  In addition, Earline and Cletus Cole assert claims of economic damages, including but not limited to lost income, lost benefits, travel expenses incurred pleading with Defendants to adequately investigate and prosecute the murder of their son, and expenses involved with preparation of materials for presentation to Defendants.  Id. at 27, ¶ 59.

In addition, Plaintiffs state that, by selectively providing less law enforcement and prosecutorial services to Native Americans than to other citizens, Defendants have violated treaty and trust obligations and responsibilities owed to Plaintiffs.  Id. at 28-30.

C.  Causes of Action

For their First Claim for Relief, Plaintiffs assert that the FBI, USAO-SD, and the individually named Defendants acting in their

official capacities deprived them of their right to equal protection of the law required under the due process clause of the Fifth Amendment to the United States Constitution.  They claim that Defendants engaged in a pattern and practice of selectively discriminating against Native Americans in providing law enforcement and prosecutorial services.

Plaintiffs' Second Claim for Relief asserts a violation of the due process clause of the Fifth Amendment to the United States Constitution.

Plaintiffs direct their Third and Fourth Claims only against Defendants Oravec and Weyand, individually.  The Third Claim alleges that these Defendants: (1) denied Plaintiffs the same law enforcement services accorded to non-Native Americans, (2) denied them statutory benefits, (3) deprived them of equal protection of the law, and (4) intentionally and willfully refused to adequately investigate the deaths of Steven Bearcrane and Robert Springfield.  The Fourth Claim alleges that these actions violated the due process clause of the Fifth Amendment.

The Fifth Claim names all Defendants and alleges violations of treaty and trust obligations.

8

In their prayer for relief against the federal agencies and agency head Weyand in his official capacity, Plaintiffs seek a decree that the alleged conduct violates the United States Constitution and an injunction against further such violations.  In their prayer for relief against Defendants Oravec and Weyand individually, they seek compensatory and punitive damages, attorneys' fees and costs, and a decree that the alleged misconduct violated the Constitution,.

## II. <u>MOTION TO DISMISS</u>

### A.  <u>Defendants' Arguments</u>

Defendants move to dismiss the Amended Complaint on the following grounds: (1) Standing, (2) Failure to State a Claim, (3) Qualified Immunity for Defendants Weyand and Oravec, and (4) Lack of subject matter jurisdiction over the United States or its employees sued in their official capacities.

Regarding standing, Defendants contend that Plaintiffs do not have standing to assert a cause of action against Defendants for an alleged failure to properly investigate and prosecute a third person. Defendants contend that Plaintiffs' claims are not justiciable because victims of crime do not have a constitutional right to secure a thorough

investigation and prosecution of a third party.  The government contends that causes of action asserting discriminatory law enforcement may only be brought by litigants who are targets of unjust law enforcement.  They contend that Plaintiffs' injuries are not fairly traceable to Defendants' conduct and that a favorable decision here would not redress their injuries.  Finally, they argue that the wrongs alleged are not within the powers of the judiciary to redress.  United States Memo. in Support of Motion to Dismiss (Court Doc. 29) at 6-21.

Defendants present several arguments in support of their contention that Plaintiffs fail to state a claim.  First, they argue that the constitutional claims should be denied because a private citizen does not have a constitutional, statutory, or common-law right to compel an agency of the United States to investigate or prosecute a crime.  Id. at 21-22.  Next, they argue that Plaintiffs are not entitled to relief under the Crime Victims' Rights Act, the Victims' Rights and Restitution Act of 1990, or the Crime Control Act of 1990.  None of these statutes, they contend, creates a cause of action for a crime victim.  Id. at 22-24.

Defendants also deny that any cause of action can be based on

10

treaty or trust obligations.  They contend that the Attorney General is vested with discretion to prosecute and that authority is presumptively immune from judicial review.  Unless a treaty, statute, or agreement imposes a specific duty or responsibility, the United States may not be compelled to act.  Id. at 26-27.

Defendants Weyand and Oravec contend that they are entitled to qualified immunity because Plaintiffs do not have a clearly-established right to an investigation of their relatives' death.  Id. at 24-25.

Finally, Defendants contend that this Court lacks subject matter jurisdiction because the United States has not waived its sovereign immunity with respect to Plaintiffs' claims.  Id. at 35-40.

B.  Plaintiffs' Response

In response, Plaintiffs contend that they have adequately alleged violations of their constitutional rights to equal protection.  Court Doc. 44 at 13.  Plaintiffs clarify that they are not seeking to enforce a right to have a particular third party investigated and prosecuted, but instead seek to enforce their rights to a non-discriminatory law enforcement and prosecutorial system.  Court Doc. 44 at 43-45.  Plaintiffs argue that their right to the equal application and enforcement of the law, in

11

addition to their right to non-discriminatory prosecutorial services, are well established. Court Doc. 44 at 14-15. Plaintiffs contend that because Defendants failed to adequately investigate the crimes committed against Steven Bearcrane and Richard Springfield due to racial animus, Plaintiffs have sufficiently alleged a violation of their right to equal protection. Court Doc. 44 at 15-16.

Plaintiffs further contend that because of their race they have been denied the basic security provided other citizens. They argue that this also violates their rights to equal protection. Court Doc. 44 at 27. Additionally, Plaintiffs contend that they have been denied access to various victim benefits and protections as a result of discriminatory law enforcement and prosecution on the reservation. They argue that this again violates their rights to equal protection. Court Doc. 44 at 32.

Additionally, Plaintiffs argue that they have adequately alleged violations of their constitutional rights to substantive due process. Court Doc. 44 at 35. While recognizing the general rule that there is no individual right to police investigation or prosecution, Plaintiffs argue that they fall within both of the recognized exceptions to this general rule. Consequently, Plaintiffs contend that they have stated a

12

substantive due process claim as a result of the FBI's failure to protect them from injury.  Court Doc. 44 at 35.

With regard to standing, Plaintiffs contend that they have alleged injuries in fact sufficient to sustain Article III standing.  Court Doc. 44 at 38.  Plaintiffs allege the following injuries in fact:

(1)   receipt of fewer and less adequate law enforcement services than non-Native American citizens, which makes them less secure than other citizens;

(2)   increased lawlessness on the reservation resulting in a severe emotional and economic impact on Plaintiffs, including historical trauma; and

(3)   deprivation of benefits and services provided to other citizens under victim assistance statutes.

Court Doc. 44 at 40.  Furthermore, by creating and perpetuating a "second-class system of investigation and prosecution of crimes against Native Americans on reservations such as the Crow Reservation," Plaintiffs claim that Defendants have caused the above-mentioned injuries.  Court Doc. 44 at 40.

Lastly, with respect to standing, Plaintiffs contend that their injuries are redressable by this Court by a declaration that the Defendants' actions are unconstitutional, and an injunction prohibiting

13

Defendants from further discriminating against Native Americans in providing law enforcement and prosecutorial services. Additionally, Plaintiffs seek money damages from the individual defendants. Court Doc. 44 at 40-41.

Plaintiffs assert that they also meet the requirements for third-party standing because they have suffered an injury in fact, have a close relationship to the third-party, and the third-parties are hindered from protecting their own interests because they are deceased. Thus, they argue that they are entitled to represent their deceased relatives. Court Doc. 44 at 42.

Plaintiffs contend that Defendants Oravec and Weyand are not entitled to qualified immunity because Plaintiffs have adequately alleged violations of clearly established rights. Court Doc. 44 at 45-48.

Lastly, Plaintiffs have alleged violations of various treaty and trust obligations. Plaintiffs contend that, because the United States has waived sovereign immunity in this case for all claims, pursuant to the Administrative Procedures Act and because this Court possesses federal question jurisdiction, the FBI and the USAO-SD are both amenable to suit for violations of treaty and trust obligations. Court

14

Doc. 44 at 49.  Plaintiffs contend that the relevant treaties provide meaningful law against which to judge Defendants' actions, and that the treaties provide them with a private right of action.  Court Doc. 44 at 50.

## III.  <u>STANDARD OF REVIEW</u>

The Court evaluates Fed. R. Civ. P. 12(b)(6) motions to dismiss in light of Fed. R. Civ. P. 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  While "detailed factual allegations" are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citations omitted).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ... ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 129 S.Ct. at 1949 (citing <u>Twombly</u>, 550 U.S. at 557).

15

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 570).  A claim is plausible on its face when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  The claim need not be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully."  Id.  Facts that are "merely consistent with" a defendant's liability fall short of this standard.  Id.  Furthermore, the Court is not obligated to accept as true "legal conclusions" contained in the complaint.  Id.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. at 1950.

IV.  DISCUSSION

    A.  Standing

The Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992).  Standing is a threshold issue – "an essential and unchanging

16

part of the case-or-controversy requirement of Article III." <u>Horne v.</u>

<u>Flores</u>, 129 S. Ct. 2579, 2592 (2009) (quoting <u>Lujan</u>, 504 U.S. at 560-61).

"'[T]he irreducible constitutional minimum of standing contains three

elements[,]' all of which the party invoking federal jurisdiction bears the

burden of establishing." <u>Chandler v. State Farm Mut. Auto Ins. Co.</u>, ___

F.3d ___, 2010 WL 938113 at *7 (9th Cir., Mar. 17, 2010) (citing <u>Lujan</u>,

504 U.S. at 560-61).

> To establish standing, a plaintiff must present an injury that is
> concrete, particularized, and actual or imminent; fairly traceable
> to the defendant's challenged action; and redressable by a
> favorable ruling.

<u>Horne v. Flores</u>, 129 S.Ct. at 2592 (citing <u>Lujan</u>, 504 U.S. at 560-61);

<u>Mayfield v. U.S.</u>, ___ F.3d ___, 2010 WL 1052341 (9th Cir. Mar. 24,

2010).

"The judicial power of the United States defined by Art[icle] III is

not an unconditioned authority to determine the constitutionality of

legislative or executive acts." <u>Hein v. Freedom From Religion</u>

<u>Foundation, Inc.</u>, 551 U.S. 587, 598 (2007) (citing <u>Valley Forge</u>

<u>Christian College v. Americans United for Separation of Church and</u>

<u>State, Inc.</u>, 454 U.S. 464, 471 (1982)).  In light of the standing

17

requirements above, the courts have repeatedly refused to recognize generalized grievances against allegedly illegal governmental conduct as sufficient for standing.  U.S. v. Hays, 515 U.S. 737, 743 (1995); see also Schlesinger v. Reservists Comm. To Stop the War, 418 U.S. 208 (1974); Ex parte Lévitt, 302 U.S. 633 (1937) (per curiam).  "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning."  Valley Forge Christian College, 454 U.S. at 483.  See also Fairchild v. Hughes, 258 U.S. 126, 129-30 (1922).  In Hein, the Supreme Court explained:

> "[A] plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy."

Hein, 551 U.S. at 601 (quoting Lujan, 504 U.S. at 573-74).

"The rule against generalized grievances applies with as much force in the equal protection context as in any other.  Allen v. Wright[, 468 U.S. 737, 755 (1984)] made clear that even if a governmental actor

18

is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." Hays, 515 U.S. at 743-44 (internal quotation marks and citations omitted). "A 'particularized' injury is one that 'affect[s] the plaintiff in a personal and individual way.'" Thomas v. Mundel, 572 F.3d 756, 760 (9th Cir. 2009) (quoting Lujan, 504 U.S. at 560 n.1). "Thus, a plaintiff normally does not have standing where the only asserted harm is a generalized grievance shared in substantially equal measure by all or a large class of citizens." Id. (internal quotation marks omitted, citing Warth v. Seldin, 422 U.S. 490, 499 (1975); U.S. v. Richardson, 418 U.S. 166, 174-180 (1974)).

The Supreme Court recognized in Allen that determining standing requires a careful examination of the complaint's allegations to ascertain whether this "particular plaintiff is entitled to an adjudication of the particular claims asserted." 468 U.S. at 752. The Court found the following questions relevant to this inquiry:

> Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of

19

obtaining relief from the injury as a result of a favorable ruling too speculative?

Id. These questions must be answered with the "notion that federal courts may exercise power only in the last resort, and as a necessity, and only when adjudication is consistent with a system of separated powers and the dispute is one traditionally thought to be capable of resolution through the judicial process." Id. (internal quotation marks and citations omitted).

In the same vein, the injury suffered by the plaintiff must be actual or imminent, not merely speculative, conjectural, or hypothetical. Summers v. Earth Island Institute, 129 S. Ct. 1142, 1149, 1155 (2009). "'[S]ome day' intentions – without any description of concrete plans, or indeed any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." Summers, 129 S. Ct. at 1151 (citing Lujan, 504 U.S. at 564) (emphasis in original).

The doctrine of standing requires federal courts to satisfy themselves that a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant invocation of federal-court

jurisdiction.  U.S. Const. Art. 3, § 2, cl. 1.  Plaintiffs bear the burden of

showing that they have Article III standing for each type of relief

sought.  Summers, 129 S.Ct. at 1149.

      1.    Individual Capacity Claims

The Court first considers Plaintiffs' standing in their individual

capacities.  As in O'Shea v. Littleton, 414 U.S. 488 (1974) and Rizzo v.

Goode, 423 U.S. 362 (1976), where the plaintiffs alleged official racial

discrimination, Plaintiffs here lack standing because, individually, they

have not alleged that they have been or are imminently likely to be

subject to the challenged practices.  See Allen, 468 U.S. at 755, 760

(absent an allegation of a specific threat of being subject to the

challenged practices, plaintiffs have no standing to ask for an

injunction).[3]

---

[3]As the Supreme Court noted in Allen:

When transported into the Art. III context, that principle,
grounded as it is in the idea of separation of powers, counsels
against recognizing standing in a case brought, not to enforce
specific legal obligations whose violation works a direct harm, but
to seek a restructuring of the apparatus established by the
Executive Branch to fulfill its legal duties. The Constitution, after
all, assigns to the Executive Branch, and not to the Judicial
Branch, the duty to "take Care that the Laws be faithfully

The individual Plaintiffs' claims here are based on alleged discriminatory treatment in the handling of the cases of their deceased relatives and generally on their status as residents on an Indian reservation.  The individual Plaintiffs do not allege that they have been the subject of discriminatory law enforcement.  They do not allege that they have been the target of an investigation or prosecution motivated by racial animus.  Nor do they claim to be the victims of a crime that was either investigated or prosecuted due to racial animus.  The injuries they have alleged are abstract, and not concrete, particularized, or actual or imminent.  See Horne, 129 S. Ct. at 2592.  As a result, the requirements for standing have not been met with respect to these claims.  See, e.g., Allen, 468 U.S. at 757 n.22.

Plaintiffs' individual claims are generalized grievances and, as such, they are insufficient to invoke the power of the federal courts. The general nature of these claims is evidenced by the Plaintiffs' own

---

executed." U.S. Const., Art. II, § 3. We could not recognize respondents' standing in this case without running afoul of that structural principle.

Allen, 468 U.S. at 761.

pleading and briefing.  For example, when describing their injuries,

Plaintiffs state:

> 50.  In discriminating against Native Americans by engaging in a
> pattern and practice of selectively providing less law
> enforcement and prosecutorial services to them than are
> provided to other citizens, Defendants have created a
> situation in which Native Americans – who are under the
> protection of the United States – live on lawless
> reservations, where crime is rampant, the well documented
> result being that Native Americans living on reservations,
> including [Plaintiffs], suffer or have suffered severe
> psychological impacts, including "historical trauma," which
> severely impacts and cripples normal life activities.

Court Doc. 21 at 22, ¶ 50.  Plaintiffs also state:

> 53.  In discriminating against Native Americans by engaging in a
> pattern and practice of selectively providing less law
> enforcement and prosecutorial services to them than
> provided to other citizens – and, thus, failing to identify
> crimes and victims of those crimes – Defendants deprive and
> have deprived Native Americans and their families of
> protections and benefits accorded other citizens under the
> Crime Victims' Rights Act, 18 U.S.C. §3771, and, 42 U.S.C.
> §10607 (Victims Rights and Restitution Act of 1990),
> including but not limited to emergency medical and social
> services, protection from a suspected offender and possible
> restitution and/or other payments.

Court Doc. 44 at 24, ¶ 53.[4]

---

[4]Plaintiffs have also claimed the denial of benefits under various
crime victims' rights statutes as an injury-in-fact.  Court Doc. 44 at 32-
34.  In Plaintiffs' words:

Plaintiffs' own characterizations of their injuries make clear that the injuries asserted are shared in substantially equal measure by a large class of people – Native Americans living on reservations.  The claimed injuries of historical trauma, lawlessness, and increased risk of being victimized are not individualized or particularized to these Plaintiffs.  As alleged, these Plaintiffs are no more or less at risk of suffering these injuries than any other Native American residing on a

---

> Plaintiffs ... are not bringing a cause of action under either of the acts.  Rather, they are arguing that the law is applied unevenly, that is, that because of the actions of the Defendants, Native Americans are not afforded the benefits provided under the Act, whereas, non-Native Americans are afforded such benefits.

Court Doc. 34 at 56.  This alleged injury, however, does not meet the requirements for an injury-in-fact for standing purposes.  The lost opportunities to receive benefits under the crime victims statutes are too speculative to give rise to an Article III injury.  The receipt of benefits under the statutes is dependent upon many uncertainties.  Even if the two relevant events were adequately investigated and reviewed for prosecution, assuming arguendo that they were not, there is no certainty that the Plaintiffs would have ever been entitled to benefits.  Furthermore, because the crime victims' rights statutes specifically deny a cause of action under the statutes, Plaintiffs could not have enforced a claim to the benefits allegedly denied.  See 18 U.S.C. § 3771(d)(6); 42 U.S.C. § 10607.  Although Plaintiffs mention mandamus in their brief,  no mandamus action has been properly plead.  Consequently, the injury claimed is too attenuated to satisfy the requirements of Article III standing.

24

reservation.  Their claims are based on their status as members of federally recognized tribes residing on reservations.  Plaintiffs are not impacted by the allegedly unconstitutional actions of the FBI and USAO-SD in a more immediate way than any other Native American residing on a reservation.

The interests of the individual Plaintiffs in the equal application of law enforcement and prosecutorial services on reservations is shared with thousands of tribal members throughout the state and country. The impact of any order of this Court on these particular Plaintiffs is too remote and too uncertain to permit the exercise of the powers of the federal judiciary.  To decide the individual Plaintiffs' constitutional claims based solely on status as residents on an Indian reservation would not be to decide a judicial controversy, but "to assume a position of authority over the governmental acts of another and co-equal department, an authority which [the Court] plainly do[es] not possess." Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587, 600 (2007)(quoting Massachusetts v. Frothingham, 262 U.S. 447,489 (1923)).

Plaintiffs seek to have the Judicial Branch compel the Executive

> Branch to act in conformity with the [due process clause of the
> Fifth Amendment], an interest shared by all citizens .... And that
> claimed nonobservance ... would adversely affect only the
> generalized interest of all citizens in constitutional governance,
> and that is an abstract injury.

See Schlesinger v. Reservists Comm. To Stop the War, 418 U.S. 208,

217 (1974).

Moreover, even if the Court were to find that the individual

Plaintiffs asserted concrete, particularized injuries, they would still lack

standing because the future injuries they fear are not fairly traceable to

these defendants, and there is no showing that a favorable decision

from the Court would redress their alleged injuries.  "The 'fairly

traceable' component of constitutional standing examines the causal

connection between the assertedly unlawful conduct and the alleged

injury, whereas the 'redressability' component examines the causal

connection between the alleged injury and the judicial relief requested."

Allen v. Wright, 468 U.S. 737, 753 (1984).

Here, the line of causation between the injuries that the

individual Plaintiffs allege and the alleged misconduct of the

government or its employees is too attenuated to meet the standing

requirements.  See Allen, 468 U.S. at 757-60.  The injuries suffered by

26

Plaintiffs are indirect and dependent upon the action of some third party not before the Court.  It is speculative whether more thorough investigation and prosecution of crimes by these Defendants would result in a reduction in the crime rate on the Crow Reservation.  It is also speculative whether more thorough investigation and prosecution of crimes by these Defendants would lessen the impacts of historical trauma on these Plaintiffs.  And, it is speculative that more thorough investigation and prosecution of crimes by these Defendants would reduce these Plaintiffs' risk of being victimized in the future by some unknown wrong-doer.  See e.g., Allen, 468 U.S. at 757-60.  The chain of causation here is too weak and involves too many unknown third parties to sustain the individual Plaintiffs' standing.

Consequently, all claims asserted individually by Plaintiffs Earline Cole, Cletus Cole, Precious Bearcrane, Veronica Springfield, and Velma Springfield should be dismissed for lack of standing.[5]

2.   <u>Representational Capacity Claims</u>

---

[5]Because Plaintiffs have failed to allege an injury-in-fact, they also fail to meet the requirements for third party standing.  <u>Serena v. Mock</u>, 547 F.3d 1051, 1054 (9th Cir. 2008).

Plaintiffs Earline and Cletus Cole seek relief in their capacities as Personal Representatives of the Estate of Steven Bearcrane.  Plaintiff Veronica Springfield seeks relief in her capacity as Personal Representative of the Estate of Robert Springfield.  For purposes of clarity, the Court will hereinafter refer to these Plaintiffs as PRs.

The PRs allege that Mr. Bearcrane and Mr. Springfield were both victims of crimes committed on the reservations.  The Amended Complaint alleges that their deaths were investigated by the named FBI defendants, and that Mr. Bearcrane's case was referred to the USAO-SD for prosecution.  Despite Defendants' arguments that the PRs lack standing because they do not have a legally protected interest in the investigation and/or prosecution of a third party, recent Ninth Circuit case law counsels otherwise.

The Ninth Circuit in Elliot-Park v. Manglona, 592 F.3d 1003, 1006-07 (9th Cir. 2010), held that law enforcement officers cannot exercise their discretion in a discriminatory fashion.  As in Elliot-Park, the PRs here are not basing their equal protection claims "on some general constitutional right to have an assailant arrested."  See id. at 1006.  Like the plaintiff in Elliot-Park, the PRs are alleging that their

28

decedents' assailants were "given a pass by [law enforcement] because of the [agents'] alleged racial bias" not only in favor of the assailants but also against the decedents as Native Americans.  <u>Id</u>.  The Ninth Circuit has made clear that law enforcement cannot "investigate and arrest blacks but not whites, or Asians but not Hispanics."  <u>Id</u>.; <u>see also</u> <u>Estate of Macias v. Ihde</u>, 219 F.3d 1018, 1028 (9th Cir. 2000) ("There is a constitutional right ... to have police services administered in a nondiscriminatory manner - a right that is violated when a state actor denies such protection to disfavored persons.").

Defendants also argue that the PRs lack standing because "[t]hey do not claim that the FBI refused to investigate ... Instead, [P]laintiffs take issue with the <u>conclusions</u> reached by the FBI ... ."  Court Doc. 29 at 26 (emphasis in original).  The Court finds this argument unpersuasive.  As the Ninth Circuit pointed out in <u>Elliot-Park</u>, "diminished police services, like a seat at the back of the bus, don't satisfy the government's obligation to provide services on a non-discriminatory basis." 592 F.3d at 1007 (citing <u>Navarro v. Block</u>, 72 F.3d 712, 715-17 (9th Cir. 1995) (alleged policy to treat domestic violence 911 calls less urgently could form the basis for an equal protection claim)).

29

With respect to Elliot-Park's claims, the Ninth Circuit stated:

> Certainly the Government couldn't constitutionally adopt a policy to spend $20,000 investigating each murder of a white person but only $1,000 investigating each murder of a person of color. Likewise, it doesn't matter that Elliot received some protection; what matters is that she would allegedly have received more if she weren't Korean and [her assailant] weren't Micronesian.

The same reasoning applies here. The controlling factor is not that the decedents received some police services; the controlling factor is that they allegedly would have received more if they were not Native American.

For the foregoing reasons, the Court finds that the PRs have met their burden of showing that they have standing. Thus, the additional grounds asserted by Defendants in their motion to dismiss are addressed below, limited to the PRs claims against the Defendants.

### B.   Sovereign Immunity and Subject Matter Jurisdiction

The Court next turns to Defendants' argument that Plaintiffs have not met their burden or providing a waiver of sovereign immunity and that this Court lacks subject matter jurisdiction over the United States, its agencies, and its employees who were sued in their official capacity.

There is a complex relationship between sovereign immunity and subject matter jurisdiction.  U.S. v. Park Place Associates, Ltd., 563 F.3d 907, 923 (9th Cir. 2009).  Although the courts have sometimes mistakenly equated sovereign immunity with a lack of subject matter jurisdiction, id. (citing Powelson v. United States, 150 F.3d 1103, 1104 (9th Cir. 1998), they are distinct issues, id. (citing Arford v. United States, 934 F.2d 229, 231 (9th Cir. 1991)).  "A waiver of sovereign immunity means the United States is amenable to suit in a court properly possessing jurisdiction; it does not guarantee a forum."  Id.  "Conversely, the mere existence of a forum does not waive sovereign immunity."  Id. at 924.  The party asserting a claim against the United States has the burden of "demonstrating an unequivocal waiver of immunity."  Id. (quoting Cunningham v. United States, 786 F.2d 1445, 1446 (9th Cir. 1986)).

The first claim (5th Amendment, Equal Protection), second claim (5th Amendment, Substantive Due Process), and fifth claim (treaty and trust obligations)[6] are stated against Defendants FBI, U.S. Attorney's

---

[6]The remaining claims are Bivens claims stated against Oravec and Weyand in their individual capacities.  Court Doc. 21-1 at 32-35.

31

Office, and Weyand in his official capacity.  They bring this suit under

the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 704.  The

APA provides, in relevant part, that:

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the
> meaning of a relevant statute, is entitled to judicial review
> thereof. An action in a court of the United States seeking relief
> other than money damages and stating a claim that an agency or
> an officer or employee thereof acted or failed to act in an official
> capacity or under color of legal authority shall not be dismissed
> nor relief therein be denied on the ground that it is against the
> United States or that the United States is an indispensable party.
> The United States may be named as a defendant in any such
> action, and a judgment or decree may be entered against the
> United States: Provided, That any mandatory or injunctive decree
> shall specify the Federal officer or officers (by name or by title),
> and their successors in office, personally responsible for
> compliance.

5 U.S.C. § 702.  This waiver of sovereign immunity applies "except to

the extent that (1) statutes preclude judicial review, or (2) agency action

is committed to agency discretion by law."  5 U.S.C.§ 701(a).  The first

exception applies where Congress has "expressed an intent to preclude

judicial review."  <u>Chaney</u>, 470 U.S. at 830.  The second exception, at

issue here, applies where Congress has not affirmatively precluded

review but a court would have no meaningful standard against which to

judge the agency's exercise of discretion.  <u>Id</u>.

> The Supreme Court has held that this provision applies only where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," Heckler v. Chaney, 470 U.S. 821, 830 ... (1985), and has emphasized that such a situation only occurs in "rare instances." Id. (internal quotation marks omitted). Even where statutory language grants an agency "unfettered discretion," its decision may nonetheless be reviewed if regulations or agency practice provide "'a meaningful standard by which [a] court may review its exercise of discretion.'" Socop-Gonzalez v. INS, 208 F.3d 838, 844 (9th Cir. 2000).

Spencer Enterprises, Inc. v. U.S., 345 F.3d 683, 688 (9th Cir. 2003).

### 1. Claims against the FBI

Although investigation of crimes falls within the discretion of law enforcement personnel, that discretion is not unfettered. Elliot-Park, 592 F.3d at 1006-07; Estate of Macias, 219 F.3d at 1028. The courts have made clear that this discretion cannot be exercised in a discriminatory fashion. Elliot-Park, 592 F.3d at 1006-07, 1008. And, while "agency refusals to institute investigative or enforcement proceedings" are presumed immune from judicial review under 5 U.S.C. § 701(a)(2), Shoshone-Bannock Tribes, 56 F.3d 1476, 1481 (1995) (citing Chaney, 470 U.S. at 832), this presumption can be rebutted when meaningful standards exist for assessing the exercise of the agency's discretion, id.

33

The Ninth Circuit has recognized that law enforcement cannot deny law enforcement services on the basis of the crime victim's race. Elliot-Park, 592 F.3d at 1006-07, 1008. The PRs allege that, as victims of crimes, their decedents were denied equal investigation services by the FBI because the decedents were Native Americans. As the PRs point out, there are meaningful standards to apply with respect to the Due Process and Equal Protection provisions of the Fifth Amendment. Court Doc. 44 at 53. Consequently, the Court finds that the United States has waived sovereign immunity with respect to the remaining claims pursuant to the APA.

### 2.   Claims Against the USAO-SD

As with law enforcement and investigatory services, "the Attorney General's authority to control the course of the federal government's litigation is presumptively immune from judicial review." Shoshone-Bannock Tribes, 56 F.3d at 1480. But, "[t]he Attorney General's power to supervise litigation in which the United States is interested or is a party has its limits. A federal attorney may not deliberately base a decision to prosecute on race, religion or the exercise of protected statutory or constitutional rights." Id. at 1481.

34

As pointed out by Plaintiffs, meaningful standards exist for assessing whether the USAO-SD has exercised its discretion in accordance with the Equal Protection provisions of the Fifth Amendment.  "It is appropriate to judge selective prosecution claims according to ordinary equal protection standards."  Wayte v. U.S., 470 U.S. 598, 608 (1985).  As a result, sovereign immunity has been waived with respect to claims against the USAO-SD.

    C.   Qualified Immunity

The Court next turns to Defendants Oravec and Weyand's claims that they are entitled to qualified immunity.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Qualified immunity is an immunity from suit rather than a mere defense to liability.  Id.  In addressing qualified immunity claims, the Court's task is to determine (1) whether the facts that a plaintiff alleges make out a violation of a federally secured right and (2) whether the

right at issue was "clearly established" at the time of the defendant's alleged misconduct.  Id. at 815-16.  The Court is permitted to exercise discretion in deciding which of these two prongs should be addressed first, and turns first to the question whether the right at issue was clearly established at the time of the alleged misconduct.

Defendants Oravec and Weyand claim that they are entitled to qualified immunity because the PRs do not have a clearly established right to an investigation or prosecution of a third party.  But this is not the right being asserted here.  The PRs are not claiming a right to have a third-party investigated and prosecuted; they are claiming a right, on behalf of the decedents, to "have the Government enforce and apply laws in a non-discriminatory manner."  Court Doc. 44 at 13.  As previously established, it is clear that the PRs' decedents had a right to nondiscriminatory investigatory services.  See Elliot-Park, 592 F.3d at 1007 ("The government may not racially discriminate in the administration of any of its services.").  The right to non-discriminatory law enforcement and prosecutorial services is clearly established.  Id. at 1008 ("The right to non-discriminatory administration of protective services is clearly established.").  The Ninth Circuit reasoned that "[i]t

36

hardly passes the straight-face test to argue at this point in our history

that police could reasonably believe they could treat individuals

disparately based on their race." Id.  There need not be a prior case

with materially similar facts in order for a right to be clearly

established.  Id. (citing Flores v. Morgan Hill Unified School Dist., 324

F.3d 1130, 1136-37 (9th Cir. 2003)).

> This is especially true in equal protection cases because the non-discrimination principle is so clear.  "The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."

Id. at 1008-09 (quoting Flores v. Pierce, 617 F.2d 1386, 1392 (9th Cir.

1980)).

The second factor to be applied is whether the facts alleged make

out a violation of a federally secured right.  Because the focus here is on

the question whether the PRs have adequately stated a claim against

Defendants, this factor is addressed in the following section.

D.     Dismissal for Failure to State a Claim

As set forth in the Standard of Review section above, the United

States Supreme Court in Iqbal articulated the pleading standards that

govern a motion to dismiss.  The Court explained:

37

> [A] pleading must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'

Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 570). In Iqbal, the

Court first identified the elements of the cause of action plead. Then,

the Court analyzed the allegations in the complaint that were not

entitled to the assumption of truth because they were too conclusory in

nature. The Court next considered the factual allegations in the

complaint to determine if they plausibly suggest an entitlement to

relief. The court here will follow the same procedure.

      1.    Equal Protection Claims

      (a) Bivens Claim

In Iqbal, the Court concluded that its decisions "make clear that

the plaintiff must plead and prove that the defendant acted with

discriminatory purpose." 129 S. Ct. at 1948. And liability cannot be

based on a theory of respondeat superior. A plaintiff must plead "that

each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 1948.

The Court next considers the allegations at issue here, including first whether Plaintiffs have made conclusory allegations that are not entitled to an assumption of truth. Iqbal, 129 S. Ct. at 1951. Here, Plaintiffs make numerous such conclusory allegations. Plaintiffs allege, for example, that "Defendants FBI, Oravec and Weyand have adopted and engaged in a pattern and practice of selectively discriminating against Native Americans in providing police services and protection on the Crow reservation in Montana... ." Court Doc. 21-1 at 13, ¶ 27. These bare assertions are akin to the conclusory allegations made in Iqbal, and, likewise, "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." See Iqbal, 129 S. Ct. at 1951. As such, they are not entitled to be assumed true.

The Court next turns to the factual allegations contained in the Amended Complaint that are entitled to a presumption of truth, in order to determine if they "plausibly suggest an entitlement to relief." Id. Plaintiffs present many general allegations that do not specifically

39

address conditions on the Crow Reservation, the decedents, or these particular Defendants.  For example, Plaintiffs allege that:

> 21.      Crime is rampant and out of control in Indian Country[.]

> [21]a.   The most recent Bureau of Justice Statistics report showed that: (i) from 1976 to 2001 an estimated 3,738 American Indians were murdered; (ii) among American Indians age 25-34, the rate of violent crime victimizations was more than 2½ times the rate for all persons the same age; and (iii) rates of violent victimization for both males and females were higher for American Indians than for all races.

***

> 22.      Native American women experience the highest rate of violence of any group in the United States.

***

> [23]b.   John Barrosso, a United States Senator from Wyoming, has noted the federal 'neglect' of law and order on Indian reservations, which has led to unacceptable law enforcement statistics in Indian Country.

***

> [24]a.   Between 2004 and 2007, the U.S. declined to prosecute 62% of Indian Country criminal cases referred to federal prosecutors.

> [24]b.   According to the Chairman of the Fort Hall Business Council [for the Shoshone-Bannock Tribes], "In many cases, the lack of prosecution by federal and state

40

authorities remains unexplained to Tribal leaders and the crime victims."

\*\*\*

[24]d.   A review by <u>The Denver Post</u> of dozens of criminal cases on more than 20 reservations substantiates widely-held concerns among American Indians that the system as it now stands functions poorly, including investigations that are chronically delayed or dropped, and serious crimes never prosecuted as felonies.

Court Doc. 21-1 at 11-12, ¶¶ 24(d).  While troubling and entitled to an assumption of truth, these allegations allow the Court to reasonably infer no more than a mere possibility that Defendants here acted unlawfully.

To support their discrimination claims against Oravec and Weyand, Plaintiffs allege that "[D]efendant FBI and individual defendants Oravec and Weyand consistently closed cases involving Indian victims without adequate investigation, especially sexual and other assaults involving Indian children and women[;]" that "Defendant Oravec has been heard to say that female Native American victims of sexual assault were asking for assault or words to that effect[;]" and that "Defendant Oravec ... acted affirmatively to hinder the investigation of those crimes and to prevent victims from receiving

41

assistance and other rights afforded crime victims under federal law[.]"
Id. at ¶¶ 36, 39-40.  Additionally, Plaintiffs allege that when the Coles
visited the FBI offices to inquire into the investigation of their son's
death, "defendant Oravec attempted to intimidate Cletus Cole by taking
Mr. Cole out of the range of cameras and showing Mr. Cole his gun." Id.
at 40(a).  They allege that Defendant Weyand, as the supervisor of the
Billings FBI office once alerted to the "egregious mishandling of the
Bearcrane and Springfield cases "refus[ed] to remedy the situations."
Id. at ¶ 42.

With respect to the death of Steven Bearcrane, the Bearcrane/Cole
Plaintiffs allege that they "repeatedly asked the defendants [sic] FBI
and the individual defendants Oravec and Weyand to do an adequate
investigation ... to no avail."  Court Doc. 21-1 at 13, ¶ 30.  They also
allege that Defendants Oravec and Weyand "refused to do anything but
the most cursory investigation" despite Bearcrane's death being ruled a
homicide, the admission of a non-Indian man to shooting Bearcrane,
and the existence of evidence contrary to a self-defense motive.  Id. at ¶
30(b).

Regarding the disappearance and death of Robert Springfield, the

Springfield Plaintiffs allege that they "repeatedly asked defendant FBI and the individual defendants Oravec and Weyand to do an adequate investigation ... to no avail," id. at ¶ 35, and, in fact, after Springfield's disappearance was reported Defendants Weyand and Oravec "refused to investigate ... even though many witnesses were available and desired to be interviewed," id. at ¶ 35(a)-(b). The Springfield Plaintiffs also allege that "Defendants FBI, Oravec and Weyand failed to positively identify the remains of Robert Springfield even though there was compelling evidence for the identification." Id. at ¶ 35(c).

These allegations against Defendant Weyand, taken as true, do not permit the Court to reasonably infer a discriminatory motive on his part. Because there is no respondeat superior liability with respect to Bivens claims, Defendant Weyand is only liable for his own actions. Iqbal, 129 S.Ct. at 1948. Acquiescence alone is not sufficient to find supervisory liability. Id. at 1949. Other than conclusory allegations, the allegations in Plaintiffs' Amended Complaint demonstrate at most that Defendant Weyand acquiesced in Defendant Oravec's allegedly discriminatory practices. They do not show that he personally acted with a discriminatory motive. The "sheer possibility" that he may have

43

acted unlawfully is not sufficient to state a claim.  Iqbal, 129 S.Ct. 1949.

Therefore, the claims asserted against Defendant Weyand are subject to

dismissal because he is entitled to qualified immunity.[7]

But the Court concludes that these allegations do allow the Court

to infer a discriminatory motive with respect to Defendant Oravec.

The allegations contained in the Amended Complaint allow the Court

to reasonably infer that Defendant Oravec was motivated by racial

animus when conducting his investigation into the death of Steven

Bearcrane.  The circumstances of Bearcrane's death – that it was ruled

a homicide, that a non-Indian did the shooting, that the investigation

was allegedly insufficient due to Oravec's discriminatory motives –

allow the Court to infer at this early stage of the proceedings that a

claim is plausible.  Similarly, although the allegations regarding Robert

Springfield are more sparse, they do charge that Oravec's refusal to

investigate the Springfield death was due to racial animus.  See

_____

[7]Moreover, Plaintiffs' equal protection claims against Defendant
Weyand in his official capacity collapse into their claims against the
FBI.  Kentucky v. Graham, 473 U.S. 159, 166 (1985) (official capacity
claims are merely "another way of pleading an action against an entity
of which an officer is an agent.").  Accordingly, this claim is dismissed as
redundant.

Amended Complaint, Court Doc. No 21-1 at 15-16.       The Court

recognizes that law enforcement agencies frequently must make

difficult decisions about where to allocate limited resources, and that

there may be alternative explanations for Oravec's decisions.

Nonetheless, under the rules governing the Court's analysis at this

stage of the proceedings, the Court concludes that the complaint does

contain non-conclusory factual allegations sufficient to plausibly

suggest that Oravec acted with a discriminatory state of mind.

Consequently, the equal protection claims asserted by the PRs against

Oravec are not subject to dismissal at this time.

### (b) Equal Protection Claims against FBI and USAO-SD

To state an equal protection claim against an agency, "plaintiffs

must show that actions of the defendants had a discriminatory impact,

and that defendants acted with an intent or purpose to discriminate

based upon plaintiffs' membership in a protected class." Committee

Concerning Community Improvement v. City of Modesto, 583 F.3d 690,

702-03 (9th Cir. 2009) (citing Lee v. City of Los Angeles, 250 F.3d 668,

686-87 (9th Cir. 2001)). "[O]fficial action will not be held

unconstitutional solely because it results in a racially disproportionate

impact.  'Disproportionate impact is not irrelevant, but it is not the sole

touchstone of an invidious racial discrimination.'" <u>Village of Arlington

Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 264-

65 (1977) (cited in <u>Modesto</u>, 583 F.3d at 703).

The central mandate of the equal protection clause "is racial

neutrality in governmental decisionmaking."  <u>Johnson v. California</u>, 321

F.3d 791, 796 (9th Cir. 2003) (overruled on other grounds) ("<u>Johnson I</u>").

"[D]istinctions between citizens solely because of their ancestry are by

their very nature odious to a free people whose institutions are founded

upon the doctrine of equality[.]" <u>Id</u>. (internal citations and quotation

marks omitted).  "Race discrimination is 'especially pernicious in the

administration of justice[,]'" <u>Johnson v. California</u>, 543 U.S. 499, 511

(2005) (quoting <u>Rose v. Mitchell</u>, 443 U.S. 545, 555 (1979)) ("<u>Johnson

II</u>"), "[a]nd public respect for our system of justice is undermined when

the system discriminates based on race[,]" <u>id</u>.

The due process clause of the Fifth Amendment guarantees every

person the equal protection of the law, "which is essentially a direction

that all persons similarly situated should be treated alike."  <u>Philips v.

Perry</u>, 106 F.3d 1420, 1424-25 (9th Cir. 2007) (internal quotation marks

46

and citations omitted).  "Preferring members of one group for no reason
other than race or ethnic origin is discrimination for its own sake," and
is forbidden by the Constitution.  Regents of the University of California
v. Bakke, 438 U.S. 265, 307 (1978).

The Court concludes here, however, that the factual allegations
against the FBI are not sufficient to state a claim.  There are no non-
conclusory factual allegations showing that the FBI Salt Lake City
Field Office has a pattern, policy or practice of discriminating against
Native Americans.  The recitation of facts concerning crime on Indian
reservations does not pertain to the FBI Salt Lake City Field Office's
activities on the reservation at issue here.

Plaintiffs also allege, in a conclusory fashion, that "Defendant U.S.
Attorney's Office in South Dakota historically has a pattern and
practice of declining prosecutions in cases in which the victims of those
crimes are Native Americans."  Court Doc. 21-1 at 20, ¶ 44.  The
Bearcrane PRs allege, with respect to Steven Bearcrane, that they
"repeatedly asked defendant U.S. Attorney's Office ... to prosecute the
person who shot their son[.]" Id. at ¶ 47.  They claim that the USAO-SD
refused to prosecute despite the Bearcrane/Cole Plaintiffs meeting with

the USAO-SD repeatedly and sending many letters, warning that the underlying investigation was inadequate, and advising the USAO-SD of the "flaws in the decision not to prosecute."  Additionally, they allege that despite year-old promises to review the Bearcrane case and "get back to the Coles with the results[,]" the USAO-SD has yet to re-evaluate the case or get back to them.  Id. at ¶¶ 47-49.

These allegations do not allow the Court to reasonably infer that the USAO-SD was motivated by racial animus in its handling of the Bearcrane case.  While Plaintiffs have alleged that 62% of Indian Country criminal cases referred to the United States Attorney's Office are declined for prosecution, they have not made any allegations, entitled to a presumption of truth, that would allow the Court to reasonably infer that Native Americans are being treated differently than similarly situated non-Native Americans.  Furthermore, there is no indication from Plaintiffs' factual allegations that the USAO-SD had a discriminatory motive when reviewing the Bearcrane case.  Consequently, these claims against the USAO-SD are subject to dismissal.

2.    Substantive Due Process Claims

48

Plaintiffs also allege substantive due process violations.  The
Supreme Court has long recognized that "the Due Process Clauses
generally confer no affirmative right to governmental aid, even where
such aid may be necessary to secure life, liberty, or property interests of
which the government itself may not deprive the individual."  DeShaney
v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195 (1989).
The due process clauses are phrased as limitations on the government's
power to act, "not as a guarantee of certain minimal levels of safety and
security."  Id.  The purpose of the clauses is to protect the people from
the government, "not to ensure that the [government] protect[s] them
from each other."  Id.  Consequently, as a general matter the
government's failure to protect an individual against private violence
does not give rise to a claim against the state for violation of the Due
Process Clause.[8]  Id.

There are, however, certain limited circumstances when "the

---

[8]As discussed in more detail above, the general premise that the state does
not have an affirmative duty to protect an individual from private violence does not
mean that the state can "selectively deny its protective services to certain
disfavored minorities without violating the Equal Protection Clause.  DeShaney,
489 U.S. at 197 n. 3.

Constitution imposes upon the [s]tate affirmative duties of care and protection with respect to particular individuals." Id. at 198.  A plaintiff falls into one of these exceptions when either: (1) a special custodial relationship exists between the plaintiff and the state, or (2) when the state is responsible for creating the danger that ultimately injures the plaintiff.  Id. at 197.

Here, Plaintiffs argue that both exceptions apply.  First, they argue that a "special custodial relationship" exists between the Tribes and the federal government placing them within the custodial exception.  Court Doc. 44 at 37.  The Court concludes, however, that the relationship between the Tribes and the federal government is not the type of relationship contemplated by this exception.  This exception was carved out to apply when "the [s]tate takes a person into its custody and holds him there against his will." Id. at 199.  "The affirmative duty to protect arises not from the [s]tate's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200.

In the substantive due process analysis, it is the State's

> affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id.  Clearly, the federal government did not have either of the decedents in custody when they were allegedly victimized.  As a result, Plaintiffs do not fall within this exception.

Plaintiffs argue that the "danger-creation" exception also applies here.

> The danger-creation exception to DeShaney does not create a rule that makes state officials liable ... whenever they increase the risk of some harm to members of the public. Rather, the danger-creation plaintiff must demonstrate, at the very least, that the state acted affirmatively and with deliberate indifference in creating a foreseeable danger to the plaintiff leading to the deprivation of the plaintiff's constitutional rights.

Huffman v. County of Los Angeles, 147 F.3d 1054, 1061 (9th Cir. 1998) (internal citations omitted).  The actions of the government in placing the plaintiff in danger must be affirmative.  Johnson v. City of Seattle, 474 F.3d 634, 639 (9th Cir. 2007).  This means that "state action creates or exposes an individual to a danger which he or she would not have otherwise faced."  Id.  Here, as in Johnson, Defendants took no

51

affirmative action with respect to either of the decedents.  As a result, the Court concludes that Plaintiffs do not fall within the danger-creation exception.  Accordingly, Plaintiffs' substantive due process claims are subject to dismissal.

### 3.   Treaty and Trust Claims

Plaintiffs' fifth claim for relief alleges violation of treaty and trust obligations against the FBI, USAO-SD, and Weyand in his official capacity.  Court Doc. 21-1 at 35-36.  The Amended Complaint alleges that, by "selectively providing less law enforcement and prosecutorial services to Native Americans than provided to other citizens,"  these defendants violated Article 5 of the Treaty with the Crow Tribe,[9] and Article 1 of the Treaty Between the United States and the Crow Tribe.[10]

---

[9]Article 5 provides in pertinent part: "[I]f any robbery, violence, or murder, shall be committed on any Indian or Indians belonging to the said tribe, the person or persons so offending shall be tried, and, if found guilty, shall be punished in like manner as if the injury had been done to a white man."  7 Stat. 266.

[10]Article 1 provides in pertinent part: "If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished

Id. at 28-29.

In their Prayers for Relief, Plaintiffs do not specifically seek any relief for treaty or trust violations, although they do seek "such other, further and different relief as this Court deems just and proper." Id. at 37-38. In their brief opposing the Motion to Dismiss, they make clear that they "are not asking that the Government prosecute a particular individual or case." Court Doc. 44 at 49 (emphasis in original). Rather, they state that they are simply asking that, in the future, "the Government investigate and prosecute without regard to the race or national origin of the victim, and in accordance with its obligations under the Treaties." Id. at 49-50.

Turning first to the trust claims, the Court concludes that Plaintiffs have neither argued nor demonstrated that they can state an independent claim for breach of trust. In Gros Ventre Tribe v. United States, 469 F.3d 801 (9th Cir. 2006), the court held that unless there is a specific duty that has been placed on the government with respect to Indians, the general trust responsibility is discharged by compliance

---

according to the laws of the United States, and also reimburse the injured person for the loss sustained." 15 Stat. 649.

with generally applicable regulations and statutes.  Id. at 809-810
(citing Morongo Band of Mission Indians, 161 F.3d 569, 574 (9th Cir.
1998)).  Plaintiffs have pointed to no specific trust duty owed to them.
Consequently, Plaintiffs' trust claims must fail.

Turning to Plaintiffs' Treaty Claims, the Court finds several
difficulties.  First, the treaties cited provide for offenders to be tried and
punished but Plaintiffs specifically state that they are not seeking this
relief, but are asking only for the general prospective relief of a court
order requiring nondiscriminatory investigation and prosecution in the
future.  Nothing in the treaties provides for this relief and the Plaintiffs
have cited no authority allowing it.  Furthermore, the Court has been
unable to find any authority providing the treaty remedy sought by
Plaintiffs. Compare Hebah v. United States, 192 Ct.Cl. 785 (1970)
(Court of Claims denied government's motion to dismiss treaty-based
claim for wrongful death).

Second, as Plaintiffs acknowledge, this action is brought under the
Administrative Procedure Act, which includes a presumption that
agency decisions not to institute enforcement proceedings are
unreviewable.  5 U.S.C. 701(a)(2).  The Supreme Court has held that an

54

agency's decision not to prosecute or enforce is a decision generally

committed to an agency's "absolute discretion."  <u>Heckler v. Chaney</u>, 470

U.S. 821, 831 (1985).  The Court explained:

> The reasons for this general unsuitability (for judicial review) are
> many.  First, an agency decision not to enforce often involves a
> complicated balancing of a number of factors which are peculiarly
> within its expertise.  Thus, the agency must not only assess
> whether a violation has occurred, but whether agency resources
> are best spent on this violation or another, whether the agency is
> likely to succeed if it acts, whether the particular enforcement
> action requested best fits the agency's overall policies, and, indeed,
> whether the agency has enough resources to undertake the action
> at all. An agency generally cannot act against each technical
> violation of the statute it is charged with enforcing. The agency is
> far better equipped than the courts to deal with the many
> variables involved in the proper ordering of its priorities.

***

> In addition to these administrative concerns, we note that when
> an agency refuses to act it generally does not exercise its coercive
> power over an individual's liberty or property rights, and thus
> does not infringe upon areas that courts often are called upon to
> protect. Similarly, when an agency does act to enforce, that action
> itself provides a focus for judicial review, inasmuch as the agency
> must have exercised its power in some manner. The action at least
> can be reviewed to determine whether the agency exceeded its
> statutory powers. ... Finally, we recognize that an agency's refusal
> to institute proceedings shares to some extent the characteristics
> of the decision of a prosecutor in the Executive Branch not to
> indict - a decision which has long been regarded as the special
> province of the Executive Branch, inasmuch as it is the Executive
> who is charged by the Constitution to "take Care that the Laws be
> faithfully executed." U.S. Const., Art. II, § 3.

Id. at 831-32.

Although the APA's section 701(a)(2) general exception to reviewability for action "committed to agency discretion" remains a narrow exception, "within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." Id. at 838.  See also Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1480-81 (D.C.Cir. 1995) (holding that the Attorney General acted within her discretion under the statutes and Fort Bridger Treaty in refusing to assert tribes' claims to off-reservation water rights, and that judicial review consequently was unavailable). Plaintiffs have not cited to a treaty provision that requires either the FBI or the Department of Justice to investigate or prosecute at the request of a tribe or individual Native Americans.

As set forth above, neither the FBI nor the USAO-SD may deliberately base their professional decisions on race, religion, or the exercise of protected statutory or constitutional rights.  Id. at 1481 (citing Wayte v. United States, 470 U.S. 598, 608 (1985)).  These constitutional rights are raised under Counts 1 through 4, discussed above.  But the treaties cited by Plaintiffs do not themselves provide a

56

"meaningful standard" for the Court to apply in determining how the FBI or the Attorney General should exercise discretion in deciding to investigate or prosecute claims in the future.  Chaney 470 U.S. at 832-834.  See also Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made...").

Accordingly, Plaintiffs have failed to state a claim for the alleged trust and treaty violations and these claims must be dismissed.

V.   CONCLUSION

Based on the foregoing,

IT IS RECOMMENDED that the Motion to Dismiss the Amended Complaint (Court Doc. 28) be GRANTED in part and DENIED in part. The Court recommends that:

(A)   Counts I, II, IV and V be dismissed, and

(B)   Count III be dismissed except as to the claims of the Personal Representatives against Defendant Matthew Oravec.

NOW, THEREFORE, IT IS FURTHER ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of U.S. Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after receipt hereof, or objection is waived.

DATED this 25th day of May, 2010.


/s/ Carolyn S. Ostby
United States Magistrate Judge

58