**Jean Bearcrane**
Attorney at Law
8416 Hwy 87 East
Billings, Montana 59101
Phone: (406) 661-2870
Email: jean_bearcrane@hotmail.com

**Patricia S. Bangert**
Attorney at Law, LLC
501 S. Cherry Street, 11th Floor
Denver, Colorado 80209
Phone: (303) 228-2175
Fax: (303) 399-6480
Email: trish@pbangertlaw.com

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| **EARLINE COLE,** | ) | |
| **CLETUS COLE,** and | ) | **CV-09-21-BLG- SEH-TJC** |
| **PRECIOUS BEARCRANE,** minor child | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' BRIEF** |
| v. | ) | **IN RESPONSE TO** |
| | ) | **DEFENDANT'S** |
| **FEDERAL BUREAU OF INVESTIGATIONS**, | ) | **MOTION FOR** |
| **SALT LAKE CITY FIELD OFFICE**, | ) | **SUMMARY** |
| **FEDERAL BUREAU OF INVESTIGATIONS,** | ) | **JUDGMENT** |
| **BILLINGS OFFICE,** and | ) | |
| **MATTHEW ORAVEC,** in his individual | ) | |
| capacity, | ) | |
| Defendants | ) | |
| _____ | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………...…i

INTRODUCTION…………………………………………………………....1

ARGUMENT………………………………………………………….……...3

    I.     The FBI's Actions Are Reviewable Under the APA…………………….3

        a.  The Plaintiffs Have Evidence Sufficient to Show Discrete Actions
           Challengeable under the APA…………………………………………4

        b.  The Actions Alleged and Proven Do Not Fall Within the Complete
           Discretion of the Agency…………………………………………...6

    II.    Plaintiffs Have Standing to Bring Their Equal Protection Claims Against
        the FBI…………………………………………………………....7

        a.  The Plaintiffs' Injury is Concrete and Particularized……………………8

        b.  Plaintiffs' Injury Can Be Redressed by the Court………………....16

    III.   The Record Evidence Shows A Constitutional Violation……………...18

        a.  The FBI Provided Discriminatory Law Enforcement Services………...18

        b.  The Investigating Agent's Inappropriate Actions Were Brought to the
           Attention of Supervisors…………………………………………..25

        c.  The Record Indicates Discriminatory Animus…………………….....26

        d.  The FBI's Discriminatory Actions Created a Barrier to the Receipt of
           Benefits…………………………………………………………28

CONCLUSION……………………………………………………………...28

CERTIFICATE OF COMPLIANCE………………………………………...29

CERTIFICATE OF SERVICE………………………………………………30

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Elliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010)…………………..6, 18, 20

Estate of Macias, 219 F.3d at 1028.

*Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982)…………………....16

*Heckler v. Chaney*, 470 U.S. 821, 105 S. Ct. 1649, 84 L. Ed. 2d 714
        (1985)………………………………………………………………………7

*Knightsbridge Marketing v. Promociones y Proyectos,* 728 F.2d 572 (1st
        Cir.1984)………………………………………………………………..14

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,
        Fla.*, 508 U.S. 656, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993)…………….8

*Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713 (6th Cir. 2015)……………..12

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267,
        1275 (D.C. Cir. 2007)………………………………………………………..16

Shoshone-Bannock Tribes, 56 F.3d 1476 (1995) …………………………………….6

*Turner v. Fouche, ,* 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567
        (1970)………………………………………………………………………...16

*United States v. Mitchell,* 502 F.3d 931, 946 (9th Cir. 2007)……………………....6

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam)……………..18


<u>Statutes</u>

5 U.S.C. § 551(13)………………………………………………………….…3

5 U.S.C. § 702……………………………………………………………...…3

5 U.S.C. § 706(1)…………………………………………………………………...3

Title 42, Sections 10606 and 10607……………………………………………..8

Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, as amended, 21 U.S.C. § 301 *et seq*…………………………………………………………………………..7

Victims of Crime Act (VOCA), 42 U.S.C. 10601, *et seq.* ………………….…9

MCA §53-9-103…………………………………………………………………..10

MCA §53-9-125(7)………………………………………………………………..10

MCA 53-9-128…………………………………………………………………....10

MCA §53-9-130…………………………………………………………………..17

Plaintiffs, by and through their undersigned attorneys, respectfully submit the following response to Defendant's Motion for Summary Judgment [Doc. #229].

## INTRODUCTION

This case began with the murder of Steven Bearcrane – a Crow Indian – by a Caucasian co-worker on a ranch within the boundaries of the Crow Indian reservation. The killer claimed self-defense, asserting that Steven Bearcrane had broken into the trailer in which he was staying. Because the murder involved an Indian on the reservation, the FBI was the Agency that had jurisdiction over the crime. Matthew Oravec was the special agent assigned to investigate the crime and provide the results of the investigation to the U.S. Attorney's office, which would decide whether to prosecute the killer.

Victim assistance is available to victims of federal crimes. Victim assistance is provided under a joint program involving federal and state officials. Federal offices do not provide financial assistance, except in limited emergency situations. State programs provided financial assistance with money from federal grants. Montana's victim assistance program is called the Crime Victims Compensation Program.

As the state partner in the federal victim assistance program, Montana determines whether a person is eligible for victim assistance. Victims of crime

include immediate families of crime victims. A victim cannot receive compensation, or receives only a portion of compensation, if he or she is culpable in a crime. The state program does not investigate crimes. Instead, it relies on investigatory agencies to provide the details of a crime so that it can determine whether a victim is eligible for benefits.

In this case, the Plaintiffs here ("the Bearcrane family") sought assistance from victim assistance offices, including financial assistance (specifically unpaid funeral expenses) from the State Victims Compensation Program. In accordance with established procedures, the State Program reached out to the FBI for the details of the murder of Steven Bearcrane and for the FBI's conclusions as to whether Bearcrane was culpable in his own death. The FBI stated that Bearcrane was culpable in his own death because the killer had acted in self-defense. Primarily on the basis of that report, the State Program denied the Bearcrane family crime victim assistance.

The FBI's report that Steven Bearcrane was culpable in his own death was based on an investigation that was so inadequate and biased that it amounted to discrimination against the Bearcrane family. Evidence shows that: (i) the police services provided were clearly inadequate; (ii) the Bearcrane family was denied services otherwise made available to the general public, and that the denial was due to some arbitrary or otherwise constitutionally impermissible reason; and (iii)

2

an obviously appropriate investigative step that inexplicably was not taken. In addition, evidence shows that the agent charged with investigating the murder engaged in stereotyping of the Native victim, assumed that he was the aggressor and, then, took affirmative steps to ensure that the self-defense claim of the killer was upheld, including mischaracterizing evidence in the prosecution letter to the U.S. Attorney and affirmatively withholding evidence that contradicted the self-defense claim.

In short, the FBI created a barrier – based on animus and discriminatory motive – to the Bearcrane family's receipt of victim assistance benefits available to all other citizens.

## ARGUMENT

### I.      The FBI's Actions Are Reviewable Under the APA

The Administrative Procedure Act (APA) authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Agency action" is defined in 5 U.S.C. § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act.*" (Emphasis added.)  Under the APA, a court may "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

Plaintiffs in this matter are asking the Court to review specific actions of the FBI, actions not within the complete discretion of the Agency, which resulted in the creation of a barrier to their receipt of benefits available to all other citizens – crime victim assistance.

### a. The Plaintiffs Have Evidence Sufficient to Show Discrete Actions Challengeable under the APA

Plaintiffs have identified a discrete agency action for review under the APA -- the provision of law enforcement services to the Bearcrane family by the FBI with regard to the murder of Steven Bearcrane – and, specifically, both a failure to act and affirmative agency actions that resulted in a creation of a barrier to government services.

First, the Bearcrane family has alleged and has evidence to support its contention that the FBI provided fewer law enforcement services to it because it is Native American. As discussed in great detail below in Section III, the provision of fewer law enforcement services took the form of an investigation so inadequate and biased that it resulted in a foregone conclusion -- that Steven Bearcrane was responsible for his own death. To support their claim that the FBI's provision of law enforcement services was so inadequate and biased that it amount to discrimination, the Bearcrane family can show evidence of many individual actions that were wrongfully taken, or not taken by the Agent in charge of the Bearcrane murder investigation. As discussed in Section III below, the agent assigned to

investigate the murder: (i) did little or nothing to investigate the validity of the killer's self-defense theory and (ii) failed to do, or have done basic investigative tests.

Second, the record shows that the FBI took affirmative actions to ensure that the killer's self-defense claim was upheld, for example, as discussed below, the agent investigating the murder, Agent Oravec, intentionally ignored evidence that another ranch employee provided that contradicted the self-defense theory. Instead, Oravec said that Steven Bearcrane had to be at fault because he had been drinking and "Indians can't hold their liquor." In addition, Agent Oravec mischaracterized the evidence in his investigation in his prosecution letter to the U.S. Attorney and intentionally withheld other evidence that contradicted the self-defense claim.

As discussed below in Section II.a., the record shows that the conclusions of the FBI investigation, as crafted by Agent Oravec, were communicated by the FBI to the Montana victim compensation program (as well as to the U.S. Attorney), which resulted in the State denying the Bearcrane family compensation on the grounds that a victim is not eligible for compensation if he is culpable in the crime leading to his own death.

### b. The Actions Alleged and Proven Do Not Fall Within the Complete Discretion of the Agency

As pointed out by Defendants, Federal law vests the authority to investigate all federal crime not exclusively assigned to another federal agency with the FBI. (*see generally* 28 U.S.C. § 533) and ultimately, the United States retains jurisdiction over all major crimes committed on reservations. *United States v. Mitchell,* 502 F.3d 931, 946 (9th Cir. 2007). Thus, the FBI is required to provide law enforcement services for major crimes on reservations.

The actions detailed above – the provision of inadequate and biased law enforcement services that resulted in the creation of a barrier to the Bearcrane family's receipt of crime victim assistance -- are not within the complete discretion of the Agency and can be reviewed by the Court. In fact, the Defendant's argument that FBI investigations are completely within the Agency's discretion was raised in its first motion to dismiss and denied by the Magistrate Judge and Judge. Specifically, in the Magistrate Judge's Findings and Recommendations, as affirmed by the District Judge, she said:

> Although investigation of crimes falls within the discretion of law enforcement personnel, that discretion is not unfettered. Elliot-Park, 592 F.3d at 1006-07; Estate of Macias, 219 F.3d at 1028. The courts have made clear that this discretion cannot be exercised in a discriminatory fashion. Elliot-Park, 592 F.3d at 1006-07, 1008. And, while "agency refusals to institute investigative or enforcement proceedings" are presumed immune from judicial review under 5 U.S.C. § 701(a)(2), Shoshone-Bannock Tribes, 56 F.3d 1476, 1481 (1995) (citing

> Chaney, 470 U.S. at 832), this presumption can be rebutted when
> meaningful standards exist for assessing the exercise of the agency's
> discretion, id.
>
> The Ninth Circuit has recognized that law enforcement cannot
> deny law enforcement services on the basis of the crime victim's race.
> Elliot-Park, 592 F.3d at 1006-07, 1008. The PRs allege that, as victims
> of crimes, their decedents were denied equal investigation services by
> the FBI because the decedents were Native Americans. As the PRs
> point out, there are meaningful standards to apply with respect to the
> Due Process and Equal Protection provisions of the Fifth Amendment.
> Court Doc. 44 at 53. Consequently, the Court finds that the United
> States has waived sovereign immunity with respect to the remaining
> claims pursuant to the APA.

Doc. #53, at 33-34. The same law cited by the Magistrate Judge that was

applicable in 2010 is applicable now.

Defendant cites to *Heckler v. Chaney* as supporting its assertion that the

actions challenged here are within the FBI's complete discretion. That case

concerned a decision by an agency not to bring an enforcement action under the

Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, as amended, 21 U.S.C. §

301 *et seq. Heckler v. Chaney*, 470 U.S. 821, 823, 105 S. Ct. 1649, 1651, 84 L.

Ed. 2d 714 (1985). Decisions to prosecute, however, are not at issue here.

## II.    Plaintiffs Have Standing to Bring Their Equal Protection Claims Against the FBI

The Ninth Circuit found that Plaintiffs had alleged facts sufficient to

establish standing, including an injury in fact, a causal connection, and

redressability. Doc. #152, at 3. During the course of developing the record, the

Bearcrane family has elicited facts sufficient to evidence a denial of benefits under the crime victims' rights statutes. Specifically, there is evidence to show that, with the help of the FBI victim specialist, the family requested federally-funded benefits from the Montana state victims assistance partner and that the state denied them benefits because of the biased actions of the FBI.

### a. The Plaintiffs' Injury is Concrete and Particularized.

The Bearcrane family is contending that they should have been considered for crime victim benefits on an equal basis with other applicants, and that they were not because the FBI created a barrier because of discriminatory animus. To show an injury in such a case, the Bearcrane family need not show that they **would have** received the benefits absent FBI actions, but only that they were denied consideration for benefits on an equal basis. As the Court stated in *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666, 113 S. Ct. 2297, 2303, 124 L. Ed. 2d 586 (1993):

> The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

### i. _Background Regarding Victim Assistance Programs_

There are various federal crime victim assistance statutes, the majority of which are found in Title 42, Sections 10606 and 10607. The Office for Victims of Crime (OVC) within the U.S. Department of Justice is the focal point for the

implementation of the Victims of Crime Act (VOCA), 42 U.S.C. 10601, *et seq.*

State compensation programs, such as the Montana Crime Victims Compensation

Program, are part of the federal VOCA program.  Under that program, the states

receive federal grant money to provide assistance to victims of crimes under the

jurisdiction of federal law enforcement programs.  In addition, when states pay

expenses of crime victims, they are reimbursed by the federal government.

The FBI has entered into a memorandum of understanding with the Office

for Victims of Crime ["MOU"] to utilize state programs to assist crime victims,

and provide information to those programs, as follows:

> In this regard, the FBI has established victim-witness assistance to use the
> resources of State crime victim compensation assistance programs to assist
> victims of crimes with the economic implications of crime victimization.

**Exhibit L** [MOU], at 3.  Thus, the state and federal programs work in partnership

to assist victims of crimes.

Victims of crimes are eligible for benefits during the investigatory stage and

the provision of benefits is not limited to whether a crime is prosecuted.  All FBI

employees are responsible for ensuring those benefits and rights.  According to the

Manual "the active cooperation of case Agents is necessary in order for the [victim

specialist] to successfully perform these tasks."  *Id.*  One of the tasks that FBI

employees are required to do under the victim assistance statutes is to provide

information about public and private programs that are available to provide support to the victims.

The Federal program does not provide financial benefits, except for limited emergency funds. State programs, such as the one in Montana, provide benefits to cover pecuniary expenses of victims, including medical costs and funeral expenses not covered elsewhere. *See* MCA 53-9-128.

Persons eligible for victim assistance under federal law include any person "who has suffered direct physical, emotional/psychological, or pecuniary harm as a result of the commission of a crime," which includes members of the immediate family of a crime victim. Persons eligible for victim compensation under Montana law include dependent children of crime victims, including the Plaintiff Precious Bearcrane, the daughter of Steven Bearcrane, and persons authorized to act on behalf of victims or dependent children, such as Steven's parents.[1] MCA §53-9-103.

A person is not eligible for victim assistance under the AG Guidelines if he or she "is culpable for the crime being investigated or prosecuted." *Id.* Likewise, under the Montana crime victim statute, a person is not qualified for benefits, or can receive a lesser benefit, if he or she "contributed to the infliction of death or injury." MCA §53-9-125(7).

_____

[1] *See* Exhibit V [Personal Representative Designation].

State programs must rely on information provided by the FBI to determine eligibility for benefits and specifically "whether the applicant is innocent of illegal activity or contributory conduct in connection to the crime for which he/she is requesting financial assistance." The FBI provides information to the state programs through the process set out in the MOU. Specifically, the Agency provides a summary of the case in a letter and detailed information on a form generally called a "Verification of Incident." The Verification form asks about drug use of the perpetrator and whether the victim is culpable in the crime for which he is seeking benefits.

The Montana Crime Victim Compensation Program, at the time relevant to this case, consisted of six people. When a request for victims assistance regarding a federal crime was received by the state program, that office had to rely on information provided by federal law enforcement agencies to determine eligibility, including whether the victim was culpable for the crime being investigated.

ii.     <em>The Bearcrane family Asked for Victim Assistance Benefits</em>

In this case, the facts show that the Bearcrane family applied for compensation benefits from the Montana crime victim compensation program. The FBI victim specialist, Michele Steward, assisted Earline Bearcrane in filing out the application and the Montana program victim specialist formally notified the FBI of that application. The Bearcrane family specifically requested

reimbursement for uncovered funeral expenses for Steven Bearcrane's funeral. The Montana victim specialist testified that, if Bearcrane had been considered a victim, the State would have paid the uncovered funeral costs.

### iii.    *Denial of Benefits Was Caused by FBI Action*

The fact that benefits were denied by a third party is not determinate of the standing issue here.  The Circuit Court, in *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713 (6th Cir. 2015), said that:

> "While the Court did enumerate a heightened standard for demonstrating causation in the case of indirect injury caused by a third party, it makes clear that such a standard is satisfied where the plaintiff was able to "adduce facts showing that [the third-party's] choices have been or will be made in such manner as to produce causation and permit redressability of injury."

(Internal citation omitted).  The Court went on to say that it is "possible to motivate harmful conduct without giving a direct order to engage in said conduct. *Id*., at 714.  That is the case here.

In this case, there is a direct line of causation between the FBI's actions and the denial of benefits by the Montana crime victim compensation program.  As discussed above, the Montana victim compensation program determines whether a victim seeking compensation is eligible for benefits, including the determination of whether a person is culpable for his own victimization.  That determination is made on the basis of the preponderance of the evidence.  In making those

determinations, Montana has to rely on the evidence supplied by the FBI in the form of a summary of the case and detailed information on a Verification form.

In this case, the FBI victim specialist drafted a letter with a summary of the case. That summary was drawn from the FBI's prosecution letter to the U.S. Attorney. The FBI victim specialist also attempted to fill out the Verification form. However, she noted that she had to rely on Agent Oravec, as the investigating agent, for information for the form and he was exceedingly difficult to work with. She noted that he did not answer her requests for information and that he specifically did not want her to answer the question about the killer's drug and alcohol use.

The victim specialist filled out what she could on the Verification form and sent it to the Agent in Charge, Ernest Weyand. The form was signed and sent to the State victim compensation program.

The Defendant provided the transmittal letter referencing the Verification form to the Plaintiffs. The FBI victim specialist said that the form existed and a copy was placed in FBI files. State notes from the processing of the Bearcrane claim also stated that the FBI had transmitted a verification form to them and that the State based its decision to deny benefits in part on the form. The Defendant has refused to provide the form to the Plaintiffs. As a result, the Plaintiffs ask the Court to draw a negative inference from that failure, specifically, that the FBI

answered the culpability question in the affirmative, telling the State program that Steven Bearcrane was responsible for his own death. *Knightsbridge Marketing v. Promociones y Proyectos,* 728 F.2d 572, 575 (1st Cir.1984) citing to 2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979) (emphasis added)."

The victim specialist for the State stated that her decision to deny benefits was based primarily on her belief that Bearcrane had broken into the killer's trailer and attacked him. The specialist testified that she reached the conclusion that Steven Bearcrane was 100% culpable for his death on the letter sent by the FBI and the attached verification form.

In addition to the Verification Form, the FBI provided information in at least one telephone call with State victim compensation specialist. After another State victim specialist reviewed the FBI summary and Verification form, she called and spoke to Agent Oravec. She asked Oravec to confirm her conclusion, reached after reviewing the summary and form, that Steven Bearcrane was responsible for his death. He did confirm that conclusion.

Oravec did **not** refer the state victim specialist to the BIA. The BIA is the federal agency which, along with the FBI, has jurisdiction to investigate crimes in Indian Country. The BIA was also on the scene of Steven Bearcrane's murder and did a report that contradicted facts in the report of the Yellowstone Sheriff's Office and in Oravec's own characterization of the facts, as discussed below. The State

victim specialist testified that she was not told by the FBI that the BIA report stated that the door did not appear to be broken into. Nor was she told that one of the Yellowstone officers reported that the killer had invited Bearcrane into his trailer.

Oravec also referred the state victim specialist to the Yellowstone Sheriff's Office and the U.S. Attorney. While the AUSA assigned to the Bearcrane case allegedly did some investigation of her own, she ultimately relied on evidence from the FBI. For example, in her Declaration, Kohn said that one of the facts she relied upon in believing the self-defense claim was the broken door frame, something mentioned in the prosecution letter. Doc. #230-5, at 9, ¶22. The FBI did not send Kohn the report of the BIA criminal investigator who was on the scene of the Beracrane murder and reported that, upon inspection, the door hinges were loose, but there was dust on them that had not been disturbed indicating that the hinges had been loose for a long period of time.

The Yellowstone Sheriff's Office did report that the killer made statements that he had acted in self-defense. The county sheriff, however, had no jurisdiction over the murder of Steven Bearcrane, and did not do any independent investigation into the crime or the self-defense claim. The Sheriff's Office only assisted in collecting evidence at the crime scene.

Thus, the FBI's investigation formed the basis for the denial of benefits by the State victim compensation program. Because that investigation and its

conclusions were so inadequate and biased, as discussed below, the FBI created an unlawful barrier to receipt of victim compensation.

**b. Plaintiffs' Injury Can Be Redressed by the Court.**

As noted above, the Ninth Circuit found that the Bearcrane family members had sufficiently alleged an injury in fact, a causal connection, and redressability when they alleged a denial of benefits under the crime victims' rights statutes, resulting from Defendants' alleged bias against Native Americans  Doc. #152, at 3. Presumably, to the extent that the Bearcrane family can show genuine issues of material fact as to their allegations, the Ninth Circuit would again find redressability.

Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury.  *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982).   *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007)

The Court can redress the wrong done to the Bearcrane family here.  As discussed above, the injury in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. *See, e.g., Turner v. Fouche,* 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970).

Of course, the Court cannot make the State crime victim compensation program grant compensation to the Bearcrane family. Nor can it order the FBI to do an unbiased investigation. The Court, however, can remove the discriminatory barrier to consideration of the grant of benefits created by the FBI by declaring that the FBI engaged in unlawful discriminatory conduct in its provision of law enforcement services to the Bearcranes, specifically its inadequate and biased investigation and conclusions. The Defendant asserts that "the declaration [of the Court that the FBI had acted unlawfully] would not alter the information provided to the CVCP or its analysis." If the Court found that the FBI's investigation and conclusions were the result of a discriminatory action, that would certainly alter the information considered by the State and allow a fair analysis of the Bearcrane's claim.

Further, to the extent that the Court removes the barrier created by a discriminatory investigation and biased results, the Bearcrane family can ask for reconsideration of their claim for benefits. Under Montana law, the office of victim services can "on its own motion or on request of the claimant … reconsider a decision making or denying an award or determining its amount." MCA §53-9-130. The statute provides no time limit. As a result, the Bearcrane family can ask for reconsideration of the denial of its claim for victim compensation.

### III. **The Record Evidence Shows A Constitutional Violation**

Defendant, in its Motion, states that the Plaintiffs can show a Fifth Amendment violation related to law enforcement by showing: (i) that the police services provided were clearly inadequate, or (ii) that they were denied services otherwise made available to the general public, and that the denial was due to some arbitrary or otherwise constitutionally impermissible reason, citing to *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Doc. #229[Motion], at 30. Defendant continued by saying that a violation may be proven by pointing to an obviously appropriate investigative step that inexplicably was not taken, citing to *Elliot-Park v. Manglona*, 592 F.3d 1003, 1006 (9th Cir. 2010). *Id.* As discussed below, Plaintiffs are able to make that showing.

#### a. **The FBI Provided Discriminatory Law Enforcement Services**

Evidence in the record shows that the FBI agent assigned to investigate Bearcrane's murder: (i) failed to adequately and completely investigate the validity of the killer's self-defense theory; and (ii) failed to do, or have done basic investigative tests. Further, the record shows that the FBI took affirmative steps to ensure that the self-defense claim was upheld, including: (i) ignoring evidence that refuted the claim; and (ii) mischaracterizing and/or and intentionally omitting evidence in the letter to prosecutors that contradicted the self- defense claim.

##### (i) *Lack of Investigation of self-defense*.

In a criminal case in which a defendant is pleading self-defense, it is reasonable to assume that law enforcement officials would investigate the efficacy of the self-defense claim, including the character of the person utilizing the defense. In the FBI's investigation of Steven Bearcrane's murder, the focus was on the victim's character. The investigating agent, Matthew Oravec, testified during his deposition that he did no investigation of Bearcrane's killer's character. Oravec testified that evidence of bad character was not relevant to his investigation, despite the fact that the prosecutor's handbook says that such evidence is relevant to the decision to prosecute or not.

Oravec completed his entire murder investigation in approximately a month (February 5-March 21). During that time, he failed to talk with numerous people who offered testimony about the bad character of Bearcrane's killer, including: (i) another ranch worker, Dave Siegel, who had been identified as a person knowing about the killer's drinking and violent nature; and (ii) persons who could testify that the killer got into an argument with another man, went to his home with a gun and refused to leave until the police were called. The Bearcrane family actually gave Oravec a list of persons who knew the killer's history of violent acts and threats. There is no record that Oravec interviewed any of the people on that list, except one, or followed up on most of the negative information provided him about

the killer.  Further, at a certain point, Oravec's supervisor, Ernest Weyand told Oravec to stop doing interviews of potential witnesses.

Most striking is that Oravec ignored the evidence given him by Kassandra Leachman, a ranch employee present at the time of the murder, which contradicted the self-defense claim.  Ms. Leachman executed an affidavit saying that, during her interview, Oravec seemed completely uninterested in her observations about the validity of the self-defense claim, including the facts that: the killer had recently bragged about being able to shoot someone between the eyes and get away with it by claiming self-defense; Bearcrane did not appear to be drunk; another employee reported that the knife found near Bearcrane's body had been planted; the trailer in which the killer was staying was open to all ranch employees.  In fact, Ms. Leachman reported that Agent Oravec seemed to have prejudged the Bearcrane case, saying that Bearcrane had been drinking and Indians can't hold their liquor. In short, instead of investigating the self-defense claim, Oravec simply assumed that Bearcrane was the aggressor.

Also telling, Oravec never tested the killer for drugs or alcohol.  This is completely analogous to the *Elliott-Park* case.  In that case, the specific point or line demarcating an inadequate investigation was the failure to do a Breathalyzer test in *Elliott-Park v. Manglona,* 592 F.3d 1003 (9th Cir. 2010).  Like the facts in

the *Elliott-Park* case, in which the gentleman of the preferred race, was not given a sobriety test, the killer, a white man, was not tested for drugs or alcohol here.

On the other hand, Oravec did have Bearcrane tested, and alcohol and traces of meth were found. However, Oravec admitted that he had no physical evidence indicating the quantity of the drug in Bearcrane's system or the date of the last usage. In addition, the killer alleged that Bearcrane was drunk (had drunk a bottle of whiskey) the day of the murder; but, when a bottle of whisky was found in the ranch pasture, Oravec had no fingerprint analysis done.

(iii)   *Lack of testing.*

The FBI also failed to complete investigative reports that would ordinarily be done, for example:

- A blood splatter analysis could not be completed "due to the lack of close-up pictures with and without rulers."

- Oravec testified that no tests were done on directionality of shots.

- No gunshot residue kit or fingerprints were obtained by the Coroner "in consultation with Matt Oravec."

- Oravec discontinued DNA analysis.

**[It should be noted that the Plaintiffs sought "documents containing, referencing or related in any way to investigatory procedures, processes**

**and/or instructions regarding FBI investigations" in discovery, but Defendant refused to provide those.  A motion to compel is pending.]**

*(iii)  Mischaracterizing or Omitting Evidence of Self-Defense.*

In addition to a failure to provide adequate police services, the record shows that the FBI acted affirmatively to ensure that the killer's self-defense claim was upheld.  As noted above, the FBI never passed on to the U.S. Attorney Kassandra Leachman's evidence that contradicted the killer's self-defense claim.

Further, Agent Oravec ignored the report of the BIA agent on the scene of Steven Bearcrane's killing.  That report stated that the frame around the door that Bearcrane had alleged broken into was not damaged as reported by Yellowstone.  Oravec did not even include the BIA report in the files sent to the U.S. Attorney, even though it was routine to include BIA investigative reports in the FBI file.

Likewise, Oravec ignored the report of a Yellowstone deputy that the killer had said that he had invited Bearcrane into his trailer.  Both of these reports obviously contradict the killer's claim that Bearcrane had broken into the trailer in which he was staying and attacked him.

At the conclusion of his month-long investigation, Oravec drafted a prosecution letter to Mara Kohn, the AUSA assigned to the Beracrane murder, outlining his findings in the Bearcrane case.  The letter is so biased toward a finding of self-defense that no reasonable person could conclude that the

investigation had been fair to the Native American victim. For example, the narrative part of the letter has not a single negative comment about the killer, despite substantial evidence of his bad character, and concludes that the killer's statements were consistent with the evidence.

Also, Oravec made statements in the letter about evidence that he knew was contradicted by other facts, without pointing out the contradictions. For example, in the letter:

- Oravec cited to a broken door frame despite the fact that the Bureau of Indian Affairs investigator noted in his report that the door frame was not recently broken.

- Oravec represented that the two other ranch workers who he interviewed said that Bearcrane was very angry and aggressive and had been drinking, despite the fact, as noted above, that those witnesses did not seem to say what was reported.

- Oravec failed to mention that the Coroner's report stated that there was no powder residue around Bearcrane's wound and that there was no sign of a struggle.

In short, Oravec's letter to the prosecutor was written such that there could be no conclusion other than self-defense. Especially glaring is the information Oravec conveyed about the knife found at the scene. Specifically, Oravec testified

that the prosecutor, Mara Kohn, was especially concerned about the knife found at the scene of the crime.   Oravec testified repeatedly during his deposition that the evidence he collected showed that the knife was irrelevant and played no part in the investigation because the killer specifically stated that Bearcrane had not attacked him with a knife.  Yet, Oravec said in his prosecution letter that "It is **unknown** if Bearcrane was attempting to get the knife as he lunging [sic] at Holcomb, only that it was found next to him."  Exhibit A (emphasis added).  While Kohn, in her declaration, goes to great lengths to say in that the knife played no part in her decisions about the Bearcrane case, Cletus Cole testified in his deposition that Kohn told that family that the U.S. Attorney had declined to prosecute Holcomb because he shot Bearcrane while he was "towering over him" with a knife.

Kohn's recent declaration confirms the fact that she did not receive all of the facts from Agent Oravec.  She stated that she was persuaded about the validity of the self-defense claim by: the broken door jam; the broken table leg; two witnesses said that Bearcrane was angry.  See Doc. #230-5, at 7, ¶22.  As noted above, the BIA report – which was not forwarded to her -- says the door was not recently broken.

Kohn also said that it was important that the killer did not claim that Bearcrane had attacked him with a knife.  Oravec, however, did not tell her that

there was strong evidence supporting the fact that the killer had planted the knife, for example, Ms. Leachman stated that she told Oravec that the ranch foreman told her that Holcomb had planted the knife, and fingerprint analysis showed that only the killer's prints were on the knife.

### (iv) BIA Not Allowed to Investigate

It is also instructive that Oravec allowed the Yellowstone Sheriff's Office to process and collect evidence at the scene when that office had no jurisdiction. At the same time, notification to the BIA was delayed. The BIA did not participate in the investigation of Bearcrane's murder except for the collection of evidence at the scene.

### b. The Investigating Agent's Inappropriate Actions Were Brought to the Attention of Supervisors

The above-cited actions, and the discriminatory nature of the investigation were brought to the attention of Oravec's supervisors on multiple occasions. For example, the Bearcrane family complained to Oravec's supervisor about the inadequacy of Oravec's investigation and Oravec's rudeness to them, and requested repeatedly that another agent be assigned to the case. On February 11, 2005, nine days after Bearcrane was shot, the United States Commission on Civil Rights sent a letter via facsimile and FedEx priority overnight mail to Oravec's supervisor at the FBI office in Billings, Montana asking for information about the case after receiving a formal request from the Bearcrane family. Doc. #98-1.

On October 11, 2005, dissatisfied and believing Oravec was racially biased against Native Americans and in favor of "non-Indians" to the detriment of the investigation into the shooting death of Bearcrane, the Bearcrane family formally complained to the FBI's Salt Lake City office about the inadequacy of the investigation, bias, and racial discrimination. Those supervisors, however, ignored the actions and, in some cases, signed off on them, for example, signing off on the prosecution letter. In fact, at a certain point in the investigation, Oravec's supervisor, Ernest Weyand, told Oravec to stop interviewing people in the Bearcrane investigation.

### c. The Record Indicates Discriminatory Animus

There is sufficient evidence in the record to show discriminatory animus against Native Americans, or, at the least, to create genuine issues of fact regarding animus toward Native Americans.

Agent Oravec's own animus is shown by statements made by him that would be admissible at trial. For example, Linda Coulter, who worked with Oravec, specifically heard him say that Native American women "give it away," and suggested that they asked for sexual assault. It is difficult to see such a statement as anything but animus toward Native Americans. Kassandra Leachman, the daughter of the owner of the ranch on which the murder took place and a worker on that ranch, executed an affidavit stating that Oravec said words to

the effect that Native Americans "can't hold their liquor" and that Indians "have a generic and allergic reaction to alcohol."  He also would not allow her to elaborate on any of the points she was trying to make that contradicted the killer's claim of self-defense.  Leachman said that she got the impression that Oravec's interview "was a formality" and that Oravec "already had his mind made that Steven was to blame for his own murder."  The statements of Couture and Leachman are statements by an opposing party against interest, which are not considered hearsay under Rule 801(d)(2).

In addition, the FBI victim specialist reported that Oravec made statements such as "That's just the Res."  She explained that Oravec was saying "that's just how things are" on the reservation.

Also, Oravec demonstrated to the Bearcrane family that he was completely disinterested in the murder of Steven Bearcrane.  In a meeting the Bearcrane family had with the FBI about Bearcrane's murder, Oravec was rude, disinterested, constantly looking at the clock, and asked who "Steven" was.  After the meeting, Oravec took Cletus Cole aside and showed him his gun while asking if Mr. Cole "had a problem with him."

Finally, the biased nature of the prosecution letter, as discussed above, demonstrates animus toward Bearcrane and preference for his non-Indian killer.

### d. The FBI's Discriminatory Actions Created a Barrier to the Receipt of Benefits

As explained in detail above, the conclusions of Oravec's biased, misleading and clearly inadequate investigation – that Steven Bearcrane was responsible for his own death -- were provided to the Montana crime victim assistance program, which then denied benefits to the Bearcrane family.

Thus, there is enough evidence to raise genuine issues of material fact regarding the discriminatory provision of law enforcement services on the part of the FBI, and the creation of a barrier to the Bearcrane's receipt of victim assistance.

## CONCLUSION

For the reasons stated above, the Bearcrane family respectfully requests that the Court deny the Defendant's motion for summary judgment.

Respectfully submitted this 29th day of April, 2019.

*/s/ Patricia S. Bangert*

_____
Patricia S. Bangert, Attorney at Law, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), I hereby certify that the foregoing

**"PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR**

**SUMMARY JUDGMENT"** complies with the word limitation requirements set

forth in L.R. 7.1(d)(2). Using the word count function of Microsoft Word 2010©,

the number of words contained in this brief, excluding the caption and certificates

of compliance and service as allowed by L.R. 7.1(d)(2)(E), is: **6348.**

Dated: April 29, 2019

*/s/Patricia S. Bangert*

_____

Patricia S. Bangert

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2019, I electronically filed the foregoing

"**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR**

**SUMMARY JUDGMENT"** using the CM/ECF system, which sent notification to

the following:


James G. Bartolotto, Esq.
Kelly Heidrich, Esq.
Senior Trial Attorneys
Department of Justice, Civil Division, Torts Branch
Constitutional & Specialized Tort Litigation
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Tel: 202-616-4174
Fax: 202-616-4314
E-mail: james.bartolotto@usdoj.gov
*Attorney for Defendants*


*/s/Patricia S. Bangert*
_____

Patricia S. Bangert